Michael **HARRIS** and Wendy Harris, Plaintiffs,

v.

**HARVARD PILGRIM HEALTH CARE, INC.**, Defendants.

Civil Action No. 97–10259–PBS.

United States District Court, D. Massachusetts.

Aug. 7, 1998.

Paul R. Collier, III, Collier, Shapiro & McCutheon, Cambridge, MA, for Plaintiffs.

Frank E. Reardon, Kenneth R. Kohlberg, David M. Steacie, David M. Steacie, Hassan & Reardon, Steven L. Schreckinger, Kenneth W. Salinger, Palmer & Dodge, Boston, MA, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SARIS, District Judge.

Defendant Harvard Pilgrim Health Care, Inc. ("HPHC") seeks to enforce a lien against plaintiff Michael Harris for health care costs paid pursuant to the terms of HPHC's Subscriber Agreement ("the Plan"), which is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. Harris received a lump-sum settlement from the party allegedly responsible for injuries he sustained in a motorcycle accident. HPHC alleges that it is entitled under both the Plan and Mass.G.L. c. 111, §§ 70A–70D to recover out of the settlement the full cost of benefits provided. The Plaintiffs, Wendy and Michael Harris ("the Harrises"), brought suit against HPHC for violation of Mass.G.L. c. 111, §§ 70A–70D (Count I), breach of contract (Count II), equitable subrogation (Count III), and unfair or deceptive trade practices (Count IV). HPHC counter-claimed for enforcement of its lien.

Moving for summary judgment, HPHC argues that the contract and unfair trade practice claims are preempted by ERISA and that it is entitled to the full amount for benefits provided with no reduction for attorney's fees or risk of litigation. In their motion for summary judgment, the Harrises argue that Mass.G.L. c. 111, §§ 70A–70D is preempted by ERISA and that HPHC's lien should be reduced under the "make whole" doctrine. They also argue that HPHC should bear its pro rata share of the attorney's fees incurred in obtaining the settlement. Although other courts have struggled with these arguments, they raise issues of first impression in this Circuit.

After hearing, the Court concludes that (1) the subrogation clause in the ERISA plan precludes the application of the "make whole" doctrine; (2) as a matter of federal common law, HPHC is required to pay its pro rata share of the reasonable attorney's fees incurred in reaching a settlement with a third party tortfeasor; and (3) Mass.G.L. c. 111, §§ 70A–70D and Mass.G.L. c. 93A are pre-empted.

## I. BACKGROUND

The Court treats the following facts as undisputed unless otherwise noted:

On August 23, 1991, Michael Harris was injured when he struck a roadway detour with his motorcycle. He received medical treatment for his injuries pursuant to the Plan administered by HPHC.[1] Harris was covered under the Plan through his wife's employment at Somerville Hospital. HPHC provided $102,874.29 in health care costs between 1991 and 1993 for treatment of Harris' injuries.

The Harrises filed suit in Massachusetts Superior Court against J .F. White Contracting Co., Inc. ("J.F.White") and the Massachusetts Water Resources Authority, alleging that they were the parties legally responsible for Harris' injuries. On May 13, 1996, after discovering the Harrises had filed suit, HPHC asserted a lien in the amount of $130,384.80 upon the net amount payable by any third person to Harris as a result of the motorcycle accident. Later, on September 13, 1996, HPHC re-asserted the lien in the same amount.

The Harrises settled their negligence claim against J.F. White in August, 1996, in the amount of $737,500, of which $245,833.33 represented compensation to Harris' counsel and $18,893.98 represented litigation expenses. The Harrises contend their settlement of the claims against the third parties was reasonable because of factual disputes as to whether Harris had been drinking at the time of the accident, and as to how fast Harris was reported to have been driving. The Harrises' counsel based his evaluation of the settlement on the litigation risks posed by these disputes and recommended accepting settlement which, in his opinion, represented at least a one-third discount of the value of fair compensation for the injuries. HPHC was not involved in the settlement negotiations, nor at any time did HPHC retain counsel to pursue claims against the third parties.

By letter to HPHC dated October 29, 1996, the Harrises' counsel informed HPHC that the Harrises' claim against J.F. White had been settled. In the same letter, the Harrises' counsel asserted that the amount of HPHC's lien was excessive on three grounds: (1) it included costs of treatment not arising from the accident; (2) it was not reduced to reflect costs expended to retain recovery, including attorney's fees; and (3) it was not reduced to take into consideration the risks and uncertainties of litigation. The letter further asserted that HPHC's lien calculation constituted an unfair or deceptive trade practice under Massachusetts law. On December 11, 1996, HPHC served a revised notice of lien in the amount of $102,874.29. The parties agree that the amount of the December 11, 1996 lien accurately reflects the cost of medical treatment provided by HPHC.

The Harrises then brought suit against HPHC in Massachusetts Superior Court on January 3, 1997, which HPHC removed. HPHC counter-claimed for enforcement of the lien and its recovery rights under the terms of the Plan, and now moves for summary judgment as to its claim and against each of the Harrises' claims. The Harrises respond with a cross-motion for summary judgment on their lien determination claim.

## II. DISCUSSION

The purpose of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992). A motion for summary judgment must be allowed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-

---

1. Plaintiffs have waived the argument that HPHC is not an ERISA Plan Entity.

moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

The standards are the same where, as here, both parties have moved for summary judgment. "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *Dan Barclay, Inc. v. Stewart & Stevenson Serv., Inc.*, 761 F.Supp. 194, 197–98 (D.Mass.1991) (citing 10A Charles Alan Wright et. al, Federal Practice and Procedure § 2720 (2d ed.1983)).

*A. ERISA Preemption*

Here, the parties duel over the legal issue of ERISA preemption. HPHC argues, in part, that it is entitled to summary judgment because the Harrises' claims for breach of contract and violation of Mass.G.L. c. 93A and 176D are preempted by ERISA. The Harrises parry by arguing that they are entitled to summary judgment on their lien determination claims because the state statutory subrogation scheme, pursuant to which HPHC asserts its lien, is preempted by ERISA.

■ The scope of preemption under ERISA is "conspicuous for its breadth." *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). Its broad purview has prompted one district court to liken it to a " 'Pac Man' that runs around the legal landscape ... eating up other claims."

*Andrews–Clarke v. Travelers Ins. Co.*, 984 F.Supp. 49, 57 n. 31 (D.Mass.1997) (Young, J.) (citation omitted).

■ Section 514(a) of ERISA states:

Except as provided for in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....

29 U.S.C. § 1144(a). According to the statute, " 'State Law' includes all laws, decisions, rules, regulations, or other State actions having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). A law "relates" to an employee benefit plan "if it has a connection with or reference to such a plan." *California Div. of Labor Standards Enforcement v. Dillingham Constr., Inc.*, 519 U.S. 316, 117 S.Ct. 832, 837, 136 L.Ed.2d 791 (1997) (citations omitted). "A law that does not refer to ERISA plans may yet be pre-empted if it has a 'connection with' ERISA plans." *Id.* at 838, 117 S.Ct. 832. That is, the "pre-emption clause is not limited to 'state laws specifically designed to affect employee benefit plans.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (quoting *Shaw v. Delta Air Lines* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

*1. Breach of Contract*

■ HPHC argues that the Harrises' contract claim (Count II) is preempted by § 514 because the contract sued upon is the ERISA-qualified Plan. Resolution of the claim, therefore, would require "reference to" the Plan.

It is well-settled that § 514 has been interpreted to "preclude state law claims to enforce rights under an ERISA plan or obtain damages for the wrongful withholding of those rights." *Turner v. Fallon Community Health Plan, Inc.*, 127 F.3d 196, 199 (1st Cir.1997) (citing *Pilot Life*, 481 U.S. at 52–57, 107 S.Ct. 1549), *cert. denied* —— U.S. ——, 118 S.Ct. 1512, 140 L.Ed.2d 666 (1998). "[I]t would be difficult to think of a state law that 'relates' more closely to an employee benefit plan than one that affords remedies for the

breach of obligations under that plan." *Turner*, 127 F.3d at 199.

Because a contract claim alleging breach of an obligation under the Plan is preempted by § 514 of ERISA, summary judgment for HPHC is appropriate on Count II of the Harrises' Complaint.

### 2. *Mass.G.L. c. 176D and c. 93A*

HPHC next argues that the claims for unfair or deceptive business practices (Count IV) are also preempted by ERISA. The Harrises contend that these claims are viable because they do not "relate to" an employee benefit plan within the meaning of § 514(a).

■ Mass.G.L. c. 176D prohibits unfair or deceptive acts or practices in the insurance industry. "Caselaw, however, indicates that no private cause of action exists under Chapter 176D standing alone." *Ryan v. Fallon Community Health Plan, Inc.*, 921 F.Supp. 34, 38 (D.Mass.1996) (collecting cases). Mass.G.L. c. 93A, which prohibits unfair or deceptive trade practices generally, may, however, provide a private right of action for a party whose rights have been affected by a violation of c. 176D. *Id.* Nonetheless, in the context of ERISA, a claim under c. 93A based upon a violation of c. 176D is preempted by § 514 of ERISA. *Id.*

■ The Harrises contend that their c. 93A and c. 176D claims are viable because they do not require reference to the terms of an ERISA plan. This argument is unpersuasive, as HPHC derives its very authority to assert the lien from the terms of the Plan. The Plan describes HPHC's subrogation rights and the amount to which HPHC is entitled in the event that a beneficiary recovers from a third party. Any inquiry into the HPHC's lien practices would thus necessarily require reference to the Plan. Because the Court's inquiry must be directed to the Plan, the claim is preempted by § 514 of ERISA. *See Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 794 (1st Cir.1995). Summary judgment in favor of HPHC is therefore appropriate on Count IV of the Harrises' complaint.

### 3. *Mass.G.L. c.111, §§ 70A–70D*

■ Turning the table of ERISA preemption on HPHC, the Harrises argue that § 514 of ERISA preempts the statutory scheme pursuant to which HPHC asserts its lien. HPHC responds by arguing that Mass. G.L. c. 111, §§ 70A–70D is not preempted because the statutory scheme does not "relate to" an ERISA plan.

In pertinent part, c. 111 § 70A states:

a health maintenance organization which has furnished health services ... to a person injured in ... an accident shall ... have a lien for such benefits, upon the net amount payable to such injured person ... out of the any recovery or sum had or collected[,] ... whether by judgment or by settlement or compromise, from another person as damages on account of such injuries.

HPHC contends that this statute provides a valid basis for recovery of health care costs that is independent of its rights under the ERISA-qualified Plan, and that it is entitled, as lien-holder, to recover the full amount of the cost of medical services, without an allowance for attorney's fees and regardless of whether the injured person is made whole by the remainder of the settlement. HPHC's argument, however, has been foreclosed by the Supreme Court and the great weight of circuit court precedent.

The Supreme Court addressed the application of ERISA preemption to state subrogation laws in *FMC Corp., supra.* In *FMC Corp.*, the Court held that a Pennsylvania law that precluded subrogation by group health plans in actions arising out of the use of a motor vehicle "related to" employee benefit plans within the meaning of § 514(a). 498 U.S. at 58–60, 111 S.Ct. 403. The Pennsylvania statute had a "connection to" a plan because it "risk[ed] subjecting the plan administrators to conflicting state regulations." *Id.* at 59, 111 S.Ct. 403. "Application of differing state subrogation laws to plans would therefore frustrate plan administrators' continuing obligation to calculate uniform benefit levels nationwide." *Id.* at 60, 111 S.Ct. 403.

The majority of circuit courts that have addressed the preemption of state laws regulating subrogation and recovery by plan administrators since the Supreme Court's ruling in *FMC Corp.* have likewise concluded that § 514 preempts such state laws. *See McInnis v. Provident Life & Accident Ins. Co.,* 21 F.3d 586, 588–590 (4th Cir.1994); *Sunbeam–Oster Co. Group Benefits Plan for Salaried & Non–Bargaining Hourly Employees v. Whitehurst,* 102 F.3d 1368, 1374 (5th Cir.1996); *Electro–Mechanical Corp. v. Ogan,* 9 F.3d 445, 448–451 (6th Cir.1993); *Stillmunkes v. Hy–Vee Employee Benefit Plan & Trust,* 127 F.3d 767, 769–770 (8th Cir.1997); *Barnes v. Ind. Auto. Dealers Assoc. of Cal. Health and Welfare Benefit Plan,* 64 F.3d 1389, 1392 (9th Cir.1995); *Blue Cross & Blue Shield of Ala. v. Sanders,* 138 F.3d 1347, 1355–56 (11th Cir. April 13, 1998). *Cf. Baxter v. Lynn,* 886 F.2d 182, 184–186 (8th Cir.1989) (ruling before Supreme Court's opinion in *FMC Corp.* that ERISA preempts "any state subrogation law"). *But cf. Blackburn v. Sundstrand Corp.,* 115 F.3d 493, 495–496 (7th Cir.1997) (stating in dicta that ERISA does not preempt state "common fund" doctrine), *cert. denied,* —— U.S. ——, 118 S.Ct. 562, 139 L.Ed.2d 403 (1997).

HPHC argues that Mass.G.L. c. 111, §§ 70A–70D does not "relate to" an ERISA plan because it does not inhibit HPHC's recovery rights under the Plan, and that, if anything, the statutory scheme allows HPHC more expansive recovery rights than those the Plan describes. This reasoning is unpersuasive.

First, there are several portions of the statutory scheme which potentially inhibit HPHC's recovery rights under the Plan. For example, § 70B requires that, in order for a lien to be effective, a party must deliver a valid notice of the lien to the injured person, his attorney, the person alleged to be liable, and, if any, the insurer of the person alleged to be liable. Such notice must contain:

> ... the name and address of the injured person, the date of the accident, the name and location of the provider of hospital, medical, or dental services, the name of the person alleged to be liable to the injured person for the injuries received and,

if applicable, the name and address of the health maintenance organization ....

Mass.G.L. c. 111, § 70B. Further, § 70D requires that, upon request, the lien-holder provide a certified itemized statement of all charges reflected in the lien; otherwise, "such lien shall be dissolved and no person shall be held liable ... for the amount thereof." Mass.G.L. c. 111, § 70D. Any material deviation from these provisions would render the lien invalid and therefore inhibit HPHC's recovery rights.

 More fundamentally, under *FMC Corp.* and its progeny, the appropriate inquiry under § 514 of ERISA is not whether the state law allows HPHC equal or broader rights than those described by the Plan, but whether the state law risks subjecting plan administrators to conflicting state regulations. *See McCoy v. Massachusetts Inst. of Tech.,* 950 F.2d 13, 18 (1st Cir.1991) (holding that "benefit is not the relevant test" in determining that § 514 of ERISA preempts a Massachusetts mechanics' lien statute which would otherwise expand the plan's collection rights).

Because Mass.G.L. c. 111, §§ 70A–70D is preempted, HPHC may not rely on it for enforcement of its lien. By the same token, the Harrises' claim for invalidation of the lien based on alleged violations of Mass.G.L. c. 111, §§ 70A–70D is also preempted. The parties are therefore left with the subrogation and recovery rights provided for under the Plan.

### B. *Subrogation Rights Under The Plan*

The Plan contains two provisions which speak to HPHC's right to recover when a beneficiary is reimbursed by a third party:

H.4. SUBROGATION

If another person or entity is, or may be, responsible to pay for expenses or services related to the Member's illness and/or injury which [HPHC] paid or provided, then [HPHC] is entitled to subrogation rights against such person or entity. [HPHC] shall have the right to proceed in the name of the Member, with or without his or her consent, to secure right of recovery of its cost, expenses, or the value of services

rendered under this Agreement. *[HPHC] is also entitled to recover from a Member the value of services provided, arranged, or paid for, when the Member was reimbursed for the cost of care by another party.*

(emphasis added);

### H.5. MEMBER COOPERATION

The Member agrees to cooperate with [HPHC], and to provide all requested information, *and to assign to [HPHC] any monies received for services provided or arranged by [HPHC]*. The Member will do nothing to prejudice or interfere with the rights of [HPHC].

(Emphasis added). The Plan is silent with respect to attorney's fees incurred when a Member litigates to collect the costs of services from a third party tort-feasor.

 A district court interprets the language of an ERISA-qualified policy de novo unless "the benefits plan in question confers upon the administrator 'discretionary authority to determine eligibility or construe the terms of the plan.'" *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 583 (1st Cir.1993) (quoting *Firestone Tire and Rubber, Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The language of an ERISA-qualified plan must clearly confer such discretion on the plan administrator. *See Cleary v. Knapp Shoes, Inc.*, 924 F.Supp. 309, 313 (D.Mass.1996). HPHC does not point to, nor does the Court find, a provision which purports to grant discretion to construe the terms of the Plan. The Court therefore interprets the Plan's language de novo.

 To aid in the interpretation of an ERISA-qualified policy, the Court relies on certain principles that have developed within the emerging federal common law of ERISA. These principles embody common-sense canons of contract interpretation of which state law is the richest source. *See Hughes v. Boston Mut. Life. Ins. Co.*, 26 F.3d 264, 268 (1st Cir.1994). Thus, "straightforward language in an ERISA-regulated policy should be given its natural meaning." *Id.* (quotation and citation omitted). Ambiguous terms, however, should be strictly construed

against the insurer. *See Id.; Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1551 (11th Cir.1994) (collecting cases to demonstrate that contra proferentem "has been widely adopted" among circuit courts for resolution of ambiguities in ERISA-qualified policies). "Determining whether contract language is ambiguous is a question of law, and contract language is ambiguous if the terms are inconsistent on their face, or if the terms allow reasonable but differing interpretations of their meaning." *Rodriguez–Abreu*, 986 F.2d at 586.

### 1. *The Make Whole Doctrine*

HPHC argues that it is entitled under the Plan's provisions to be reimbursed in full for the value of medical services from the settlement monies provided by the third party tortfeasor in the lump sum settlement. Plaintiffs argue that the provisions regarding subrogation are ambiguous with respect to the issue of priority for funds recovered from a responsible third party tortfeasor. They urge the Court to apply the "make whole" doctrine under federal common law as a default rule in ERISA cases except where it is explicitly excluded by the terms of the plan.

 Under the "make whole" rule of contract interpretation, absent an agreement to the contrary, an insured who has settled with a third party tortfeasor is liable to an insurer-subrogee, which has discharged its obligation to pay benefits in full, only for the excess received from the wrongdoer and the insurer over the actual loss after deducting costs and expenses. See 16 Mark S. Rhodes, *Couch on Insurance Law*, § 61:64 at pp. 145–47 (2d rev. ed.1983). Many courts, however, have allowed this default rule to be overridden by "a boilerplate subrogation clause." *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1297 (7th Cir.1993) (pointing out that the equitable rule applies as a "gap-filler" only when the parties are silent). Although the First Circuit has not spoken on the issue, the other circuits have split on whether the make whole doctrine should be applied as the default rule where the ERISA plan contains standard subrogation language but does not expressly eschew it.

The Fifth, Seventh and Eighth Circuits have construed standard subrogation language, silent with respect to the "make whole" doctrine, as unambiguously affording an ERISA plan priority in a partial recovery situation. For example, the Seventh Circuit held that where a plan did not specifically accept or reject the make whole doctrine and the administrator had discretionary authority to interpret language in the plan, the administrator reasonably concluded that a subrogation clause which refers to "all claims" against a third party to the extent of "any and all payments made" did not incorporate the "make whole" doctrine. *Id.* at 1298. It reasoned that the rejection of the "make whole" principle in favor of unequivocal subrogation or reimbursement rights has the effect of reducing the price of insurance for insureds and enabling the insureds to obtain more coverage, "in effect trading an uncertain bundle of tort rights for a larger certain right, which is just the sort of trade that people seek through insurance." *Id.*

Similarly, in *Sunbeam–Oster Co., Inc. v. Whitehurst, Jr.*, 102 F.3d 1368 (5th Cir.1996), applying a de novo standard of review, the Fifth Circuit construed subrogation language that a plan is entitled to obtain reimbursement for "duplicate benefit amounts" or "benefits duplicated from another source" to mean "that the Plan is entitled to be paid back by the beneficiary all amounts that the Plan has paid to the beneficiary, or on his behalf, to the full extent—but only to the extent—that the beneficiary recovers from another source (such as insurance purchased individually, a tortfeasor, the insurer of a tortfeasor, or the like)." *Id.* at 1375–1376. Rejecting the argument that the silence in the plan regarding the make whole doctrine in a partial recovery situation created an ambiguity, the court reasoned that "the absence of more particularized technical legal language addressing the partial recovery situation cannot be grounds for supplanting the Plan Priority rule when recovery is partial, and thereby penalizing [the beneficiary's] fellow employees". *Id. Accord Waller v. Hormel Foods Corp.*, 120 F.3d 138, 140 (8th Cir.1997) (finding that the ERISA plan unambiguously provided that the plan would be first to recover any money which the insured received from a third party tortfeasor). *Cf. Ryan by Capria–Ryan v. Federal Express Corp.*, 78 F.3d 123 (3d Cir.1996) (holding that the plan had priority where it required reimbursement of "100 percent of the amount of covered benefits paid").

Expressly disagreeing with *Sunbeam*, the Eleventh Circuit adopted the "make whole" doctrine as the federal common law default rule of interpretation, concluding that the standard subrogation language did not demonstrate a specific rejection of the make whole doctrine. *See Cagle v. Bruner*, 112 F.3d 1510, 1521 (11th Cir.1997) (applying the "make whole" doctrine where "an insured has not received compensation for his total loss and the plan does not explicitly preclude operation of the doctrine"). Similarly, the Ninth Circuit held that an ERISA plan overrides the "make whole" doctrine only if it includes language specifically allowing the plan the right of "first reimbursement" out of any recovery the participant was able to obtain even if the participant was not made whole. *Barnes v. Independent Auto. Dealers Ass'n*, 64 F.3d 1389, 1394 (9th Cir.1995) (involving, however, a situation where the ERISA plan had not yet paid out benefits).

■ While this Circuit-split suggests the issue is not free from doubt, I adopt the approach in *Sunbeam, Cutting*, and *Waller* because it better promotes the policies of ERISA to ensure that a member is not reimbursed twice for medical services, and that plan benefits available to sister employees are not depleted.

The "make whole" doctrine is, in my opinion, an impractical solution in the area of personal injury settlements. These lump sum settlements generally include both actual or "special" damages such as the costs of medical services and lost wages, that are easily calculable, as well as intangible losses that are "insusceptible to precise measurement." *Frost v. Porter Leasing Corp.*, 386 Mass. 425, 429, 436 N.E.2d 387 (1982). Where a plaintiff has a serious physical injury, as here, there is no practical way of measuring the value of his pain and suffering, and the diminution of the quality of his life, without an evidentiary hearing. In addi-

tion, diminished earning capacity is often difficult to quantify.

Accordingly, in any lump sum settlement with an at-fault tortfeasor, which includes such damages for intangible losses, a court would have the difficult task of determining what portion of the settlement is needed to make plaintiff whole for his personal injuries before permitting the plan to recapture duplicative compensation for costs of medical services. To complicate matters further, where there is a likely comparative negligence defense, as here, the value of the settlement would be discounted to reflect the risk of litigation and would not compensate the member fully for his injuries. The plan would be the loser in these situations. As the *Frost* court reasoned:

> If the inquiry covered the insured's overall loss from the accident—as in fairness it should—determination of the extent of excess recovery could be equally as complex as the personal injury trial the original parties sought to avoid by settlement. Thus, litigation over subrogation would impose additional burdens on the insured, and cut into his over-all compensation for injury. Moreover, this added step in the adjustment of rights would detract from any generalized benefits that subrogation might bring to the sound use and distribution of resources available to compensate loss. Much of the "windfall" produced by overlapping coverage would be absorbed by the costs of dividing it, rather than recycled to reduce the costs of insurance.

*Id.* at 431, 436 N.E.2d 387 (citations omitted). Moreover, Justice Wilkins persuasively pointed out why medical benefits should be treated differently in a personal injury case for purposes of subrogation:

> Subrogation is a reasonable method of assisting in holding down the costs of health insurance. It prevents an undeserved windfall to the insured. It is appropriate to consider the matter of medical expenses apart from other aspects of the injured person's claim. Whatever uncertainty may

exist with respect to the other elements of damages, the amount paid under the medical insurance policy can be ascertained and dealt with independently. I see no justification for denying subrogation, as the court seems to suggest, because, in settling a case, the claimant may not have been made whole on all elements of his damages. The claimant can be and is made whole on his medical costs, to the extent of his coverage. A health insurer should not be obliged to forbear asserting subrogation rights in order to assist in making the claimant whole on some other aspect of his damages, such as lost wages and pain and suffering, for which the insured has not purchased coverage from a health insurer.

*Id.* at 433, 436 N.E.2d 387. (Wilkins, C.J. concurring).[2] Following the Fifth, Seventh and Eighth Circuits, with guidance from the Massachusetts statutory lien scheme and caselaw, I conclude that the standard subrogation provision in the Plan permits HCHP to receive the full costs of benefits provided, even though it does not contain an express rejection of the "make whole" doctrine.

### 2. *Attorney's Fees*

The circuits have differed as to the treatment of attorney's fees, particularly in cases such as the present one, where the Plan is silent on attorney's fees.

Reviewing de novo a subrogation clause which contained no provision regarding attorney's fees, the Eighth Circuit concluded, in *Waller v. Hormel Foods Corp.*, 120 F.3d 138 (8th Cir.1997), that the beneficiary was entitled to reduce the plan's recovery by the amount of reasonable attorney's fees based on "the value of legal services to the plan." *Id.* at 141. *See also McIntosh v. Pacific Holding Co.*, 120 F.3d 911, 912 (8th Cir.1997) (same). *See generally* 6A John Alan Appleman and Jean Appleman, *Insurance Law and Practice*, § 4096 at p. 287–88 (1972) ("[N]or can one sit silently and permit another, who obviously expects to be paid, to per-

---

**2.** Justice Wilkins recommended that a subrogated insurer should acknowledge a proportionate reduction in its claim to reflect the services and expenses of the claimant's attorney in collecting on the tort claim and in the event of a settlement to reflect the discount that the claimant accepted in order to obtain the settlement. *Id.* at 432, 436 N.E.2d 387. However, I am aware of no federal case law applying this pro rata approach in ERISA cases.

form valuable services for him and then not be liable for the reasonable value thereof."); *Cf. Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 993 (4th Cir.1990) (recognizing federal common law of unjust enrichment because ERISA indicates congressional desire to ensure that plans are administered equitably).

By contrast, the Third Circuit held in *Bollman Hat Co. v. Root,* 112 F.3d 113 (3rd. Cir.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 373, 139 L.Ed.2d 290 (1997), that a plan "need not specifically address attorney's fees in order to unambiguously require full reimbursement." *Id.* at 117. Rejecting the argument of unjust enrichment, the *Bollman* Court held that the Plan's requirement of reimbursement for "any payments" and subrogation of "all rights of recovery" unambiguously precluded reduction for a proportionate share of attorney's fees. *Id.* at 116–117 (citing *Ryan v. Fed. Express. Corp.,* 78 F.3d 123, 127 (3d Cir.1996)) ("Enrichment is not 'unjust' where it is allowed by the express terms of the .... plan"). *Accord Land v. Chicago Truck Drivers Union,* 25 F.3d 509, 511 (7th Cir.1994).[3]

█ Finding the reasoning of *Waller* more persuasive, I construe the silence in the Plan with respect to attorney's fees to permit the beneficiary to reduce the Plan's recovery by a pro rata amount of reasonable attorney's fees. Any other interpretation would result in a windfall to other plan beneficiaries who would get the full value of reimbursement without paying a cent. If the Harrises had not engaged an attorney to settle their earlier claims, HPHC would not have any recovery over which to exercise its recovery rights. Since HPHC benefits from the Harrises' pursuit of their cases against third parties, a pro-rata reduction of HPHC's share of the settlement fairly apportions the attorney's fees. *See United McGill Corp. v. Stinnett,* 950 F.Supp. 134, 136–137 (D.Md. 1996) (allowing participant to reduce plan's recovery by pro-rata share of reasonable attorney's fees where plan was silent with re-

spect to attorney's fees); *Carpenter v. Modern Drop Forge Co.,* 919 F.Supp. 1198, 1203–1204 (N.D.Ind.1995) (same); *Dugan v. Nickla,* 763 F.Supp. 981, 984 (N.D.Ill.1991) (same).

### III. ORDER

For the reasons stated above, HPHC's Motion for Summary Judgment (Docket No. 41) is ***ALLOWED*** with respect to Counts II and IV. The Harrises' Motion for Summary Judgment (Docket No. 45) is ***ALLOWED*** on Count I. The Court will hold a hearing on the reasonableness of attorney's fees if agreement cannot be reached on a reasonable fee by August 30, 1998.

---

**3.** Actually, the caselaw in the Seventh Circuit is murky in the area of attorney's fees. *See Blackburn v. Sundstrand Corp.,* 115 F.3d 493, 495 (7th Cir.1997) (applying the common fund doctrine requiring a party that constructively hires a law-

yer to pay for successful work to an ERISA plan), *cert. denied,* —— U.S. ——, 118 S.Ct. 562, 139 L.Ed.2d 403 (1997). *Blackburn* and *Land* are ships passing in the night.